UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARBY TRADING INCORPORATED,

                          Plaintiff,

          -v-

SHELL INTERNATIONAL TRADING AND
SHIPPING COMPANY LIMITED; MOTIVA
ENTERPRISES LLC; and SHELL OIL COMPANY,

                          Defendants.

Case No. 07-CV–0400 (KMK) (GAY)

<u>ORDER AND OPINION</u>

<u>Appearances:</u>

Manuel Ralph Llorca, Esq.
Llorca & Hahn LLP
Norwalk, Connecticut
*Counsel for Plaintiff*

Jennifer Davidow, Esq.
Phillip Bruce Dye, Jr., Esq.
Ronald Leslie Oran, Jr., Esq.
Vinson & Elkins
New York, New York and Houston, Texas
*Counsel for Shell International Trading and Shipping Company Limited*

Michael Stephan Kraut, Esq.
Morgan, Lewis and Bockius LLP
New York, New York
*Counsel for Motiva Enterprises LLC*

Robert D. Owen, Esq.
Felice Beth Galant, Esq.
Sarah E. O'Connell, Esq.
Fulbright & Jaworski LLP
New York, New York
*Counsel for Shell Oil Company*

KENNETH M. KARAS, District Judge:

On January 18, 2007, Plaintiff Darby Trading Inc. ("Darby") commenced this diversity action against Defendants Shell International Trading and Shipping Company ("STASCO"), Motiva Enterprises LLC ("Motiva"), and Shell Oil Company ("Shell Oil"). Plaintiff's Complaint alleges that Defendant Motiva breached an oral contract with Plaintiff, that STASCO and Shell Oil tortiously interfered with the contract between Plaintiff and Motiva, and that STASCO and Shell Oil tortiously interfered with the business relationship between Plaintiff and Motiva.

Motiva and Shell Oil each filed a Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and STASCO filed a Motion to Dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. All three motions were referred to Magistrate Judge George A. Yanthis for a report and recommendation.[1] On December 13, 2007, Magistrate Judge Yanthis issued a Report and Recommendation which concluded that this Court should grant Defendants' Motions to dismiss. Plaintiff subsequently filed timely objections to the Report and Recommendation.

For the reasons stated below, the Court agrees with the Report and Recommendation and grants Defendants' Motions.

## I. Factual Background

Although the Court will assume a general familiarity with the facts as discussed in Magistrate Judge Yanthis's Report and Recommendation, the Court will briefly summarize the

---

[1]On the same day that Plaintiff's Complaint was filed, this case was referred to Magistrate Judge Yanthis by Chief Judge Kimba Wood. This case was not assigned to this Court until August 6, 2007.

facts most salient to these Motions.  As the Motions before the Court are motions to dismiss, the facts taken from Plaintiff's Complaint are assumed to be true.

Plaintiff Darby is in the business of buying and selling petroleum products.  (Compl. ¶ 9.) In 1994, Plaintiff began supplying base oil products to Commercial Importadora S.A. ("CISA"), a Mexican company that supplies roughly 30% of the lubricating oil market in Mexico.  (*Id.* ¶¶ 9-10.)  The base oils that Plaintiff provided to CISA were of the "Group 1" variety, and were acquired from various points of origin.  (*Id.* ¶ 11.)

In 1998, Defendant Motiva converted its "Group 1" base oil refinery into a "Group 2" refinery.[2]  (*Id.* ¶ 11.)  Starting in 1999, Motiva began aggressively marketing its "Group 2" base oils (hereinafter "STAR base oils"), encouraging its customers to use the "Group 2" base oils on an exclusive basis.  (*Id.* ¶ 13.)  As part of this aggressive marketing program, Motiva approached Darby and "requested Darby to convince Darby's customer CISA to modify its supply chain and to begin to use various grades of base oils manufactured by Motiva, and specifically the STAR Group 2 base oils."  (*Id.*)  "In return, Motiva promised to continue to supply Plaintiff with STAR Group 2 base oils, which were not widely available, so that Plaintiff could continue to service the CISA account."  (*Id.*)  This "arrangement" between Darby and Motiva continued through 2005. (*Id.*)

In 2006, however, Motiva informed Plaintiff that it would no longer sell its STAR base oils to Plaintiff, and instead would sell the STAR base oils to STASCO, which in turn would market the STAR base oils to CISA directly.  (*Id.* ¶ 14.)  Motiva made this decision "at the

---

[2]Plaintiff alleges that Motiva was initally a "joint-venture alliance between Texaco, Shell, and Saudi Aramco," but is now a "joint-venture alliance between Shell Oil and Saudi Aramco." (Compl. ¶ 12.)

urging of its affiliate STASCO and its 'parent' Shell Oil and/or other Shell Group companies."
(*Id*.) This decision troubled Plaintiff, as Motiva continued to supply other companies with the
STAR base oils, even companies that serviced Mexican companies like CISA. (*Id*.) As a result
of Motiva's decision, Plaintiff was compelled to use its limited supply of STAR base oils to
service CISA, its largest customer, thereby preventing Plaintiff from providing the STAR base
oils to other customers that it had developed in the preceding years, and thus allegedly causing
Plaintiff to lose millions of dollars in sales. (*Id*. at ¶ 15.)

According to Plaintiff, a similar dynamic emerged in regard to Plaintiff's sale of
feedstock to Motiva. Toward the end of 2005, Plaintiff offered to sell Motiva hydrocracker
bottoms to use as feedstock for Motiva's STAR base oil refinery. (*Id*. ¶ 16.) This feedstock was
offered at very competitive prices. (*Id*.) Motiva tested samples of the feedstock and reviewed
technical information relating to the feedstock. (*Id*. ¶¶ 17-18.) Satisfied with the samples,
Motiva requested a full shipment for a trial run. (*Id*. ¶ 19.) The shipment was delivered in
January 2006. (*Id*.) Motiva ran the feedstock through the system and informed Darby that the
tests were successful and produced excellent results. (*Id*.)

Shortly after the first successful delivery, Plaintiff received reports from Motiva
indicating that STASCO did not approve of Motiva's purchases from Plaintiff. (*Id*. ¶ 20.)
Motiva conveyed this information to Plaintiff, but did not discourage Plaintiff from offering the
feedstock whenever it came available. (*Id*. ¶ 21.) Thus, Plaintiff again offered feedstock to
Motiva in February 2006. (*Id*. ¶ 22.) Although STASCO was offering the same feedstock to
Motiva, Motiva chose to purchase from Plaintiff, responding to Plaintiff's lower prices and
quality product. (*Id*. ¶¶ 22-23.)

Shortly after the second shipment was delivered, "STASCO and Shell Oil applied direct

and indirect pressure on Motiva to stop the purchase of these hydrocracker bottoms from Darby and to purchase only from STASCO, regardless of how the feedstock was presented and approved within the Motiva system, and regardless of the higher STASCO price." (*Id.* ¶ 24.) Motiva bowed to this pressure from "'higher up' in the STASCO/Shell Oil group structure," and declared that it could no longer purchase from Plaintiff in the future. (*Id.* ¶ 25.)

## II.  Discussion

### A. Standard of Review

#### 1.  Fed. R. Civ. P. 12(b)(2)

"[R]esolution of a [12(b)(2)] motion to dismiss for lack of personal jurisdiction made in the Southern District of New York requires a two-step analysis." *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).  "First, the court must determine if New York law would confer upon its courts the jurisdiction to reach the defendant," such as under the New York long-arm statute.  *Id.*  Second, if such a basis for jurisdiction exists, the court must then determine whether the extension of jurisdiction is permissible under the Due Process Clause of the Fourteenth Amendment.  *See id.*

On a Rule 12(b)(2) motion, the plaintiff has the burden of establishing that the court maintains jurisdiction over the defendant.  *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999).  However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (internal quotation marks and citations omitted) (alteration in original); *accord Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[A] prima facie showing of jurisdiction does not mean that plaintiff must show only some

evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997). A plaintiff may "make this showing through [its] own affidavits and supporting materials[,] containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal quotation marks and citations omitted) (alterations in original). While a court may consider materials beyond the pleadings, the court must credit a plaintiff's allegations in support of jurisdiction. *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

### 2. Fed. R. Civ. P. 12(b)(6)

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Twombly*, *id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the

possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 127 S. Ct. at 1968 (alteration in original). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . [,]" *id.* at 1965, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. If Plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.*; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." (emphasis in original)).[3]

A Rule 12(b)(6) motion to dismiss requires a court to "accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs." *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *see also Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). "'In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Glidepath Holding B.V. v.*

---

[3]Plaintiff suggests that *Twombly* should be limited to antitrust cases. The Second Circuit, however, does not agree. *See Iqbal*, 490 F.3d at 157 ("We are reluctant to assume that all of the language of [*Twombly*] applies only to section 1 allegations based on competitors' parallel conduct or, slightly more broadly, only to antitrust cases.").

*Spherion Corp.*, No. 04-CV-9758, 2007 WL 2176072, at *10 (S.D.N.Y. July 26, 2007) (quoting *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)).

### 3.  Review of the Magistrate Judge's Report and Recommendation

A district court reviewing a report and recommendation addressing a dispositive motion "'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'"  *Donahue v. Global Home Loans & Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)).  Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), parties may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," and must be made "within 10 days after being served with a copy of the recommended disposition."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1)(C).

Where a party submits timely objections to a report and recommendation, as Plaintiff has here, the district court reviews the parts of the report and recommendation to which the party objected under a de novo standard of review.  *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."); *see also Donahue*, 2007 WL 831816, at *1.  The district court may adopt those portions of a report to which no objections have been made, as long as those portions are not clearly erroneous.  *See Pizarro v. Bartlett*, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).

B.  Personal Jurisdiction Over STASCO

Before dealing with Plaintiff's objections, the Court must address Defendant STASCO's Motion to Dismiss for Lack of Personal Jurisdiction, which was not addressed in Magistrate Judge Yanthis's Report and Recommendation.  *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant – a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . ."); *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) ("Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary questions of service and personal jurisdiction.").  Plaintiff contends that Defendant STASCO is subject to personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. 302(a)(3)(ii) ("Section 302(a)(3)(ii)").[4]  For the reasons that follow, the Court holds that Plaintiff has failed to establish that the Court has jurisdiction over Defendant STASCO. However, the Court grants Plaintiff thirty days to amend its Complaint to satisfy the

---

[4]Plaintiff has explicitly abandoned its initial contention that STASCO is subject to long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(2).  (*See* Pl.'s Mem. of Law in Opp'n to STASCO's Mot. to Dismiss for Lack of Long-Arm Jurisdiction under CPLR 302 ("Pl.'s STASCO Response") 3 n.1.)  Furthermore, although Plaintiff never explicitly abandoned its early claim that STASCO is subject to long-arm jurisdiction under N.Y. C.P.L.R. § 302(a)(3)(i) ("Section 302(a)(3)(i)"), its briefing on the issue focused exclusively on jurisdiction under Section 302(a)(3)(ii), and neglected to address the element unique to jurisdiction under Section 302(a)(3)(i):  the demonstration that Defendant "regularly does or solicits business [in New York], or engages in any other persistent course of conduct [in New York], or derives substantial revenue from goods used or consumed or services rendered [in New York] . . . ."  N.Y. C.P.L.R. 302(a)(3)(i).  Regardless of whether Plaintiff has abandoned its argument for jurisdiction under Section 302(a)(3)(i), the Complaint does not allege that STASCO does *any* business in New York, engages in *any* course of conduct in New York, or derives *any* revenue from goods and services used or purchased in New York.  *See Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07-CV-2360, 2008 WL 169358, at *7-11 (S.D.N.Y. Jan. 16, 2008) (noting the sort of conduct which can satisfy the "doing business" standard of Section 302(a)(3)(i)).  Accordingly, Plaintiff cannot establish jurisdiction under Section 302(a)(3)(i).

jurisdictional requirements as to Defendant STASCO.

Section 302(a)(3)(ii) authorizes a New York court to exercise personal jurisdiction when: (1) the defendant commits a tort outside of New York State that causes injury within New York State; and (2) the defendant expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. *See Overseas Media Inc. v. Skvortsov,* 407 F. Supp. 2d 563, 575 (S.D.N.Y. 2006) (explicating Section 302(a)(3)(ii)). In its Motion to Dismiss, Defendant STASCO argues that Plaintiff fails to demonstrate that the tort alleged by Plaintiff caused injury within New York State.[5] "[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels Lambert*, 171 F.3d at 791 (quoting *Hermann v. Sharon Hosp., Inc.*, 522 N.Y.S.2d 581, 583 (App. Div. 1987)). "This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." *Id.*.

Plaintiff argues that the injury to its New York operations satisfies the situs-of-injury test. While Plaintiff is correct to note that lost sales or customers can satisfy the "injury within New York" requirement under Section 302(a)(3)(ii), those lost sales must be in the New York market,

---

[5]Defendant STASCO also argues that Plaintiff has failed to allege an out-of-state tort. *See Overseas Media Inc.,* 407 F. Supp. 2d at 575 ("With respect to 302(a)(3)(ii), the defendant *must firstly commit 'a tortious act outside the State*; second, . . . the cause of action [must arise] from that act; third, . . . the act [must have caused] injury to a person or property within the State; fourth, [the defendant must have] expected or should reasonably have expected the act to have consequences in the State; and fifth, [the defendant must have] derived substantial revenue from interstate or international commerce.'" (citing *LaMarca v. Pak-Mor Mfg. Co.*, 735 N.E.2d 883, 886 (N.Y. 2000) (emphasis added) (alterations in original))). For the purposes of this discussion of personal jurisdiction, the Court will assume that Plaintiff has properly alleged a tort by STASCO. The inadequacy of Plaintiff's tort allegations will be discussed later in this Opinion.

10

and those lost customers must be New York customers.  In *Citigroup Inc. v. City Holding Co.*,
for example, a case cited favorably by Plaintiff, the court noted that "[i]njury within the state
includes harm to a business in the New York market in the form of lost sales or customers.  This
rule is satisfied by Citigroup's claim that *its actual and potential customers in New York* are
confused or deceived when they view and interact with the City National web sites."  97 F. Supp.
2d 549, 568 (S.D.N.Y. 2000) (internal citation omitted) (emphasis added).  Each of the cases
cited favorably by Plaintiff echo this point:  injury in the form of lost sales or lost customers may
constitute injury for the purpose of Section 302(a)(3), but only if those lost sales or lost
customers are within the New York market.  *See, e.g., 777388 Ontario Ltd. v. Lencore Acoustics
Corp.*, 142 F. Supp. 2d 309, 324 (E.D.N.Y. 2001) ("[B]ecause of the alleged actions of moving
counterclaim defendants, Lencore *stood to lose not only its good will and customers in New York*
but also the sales representatives that were vital to the sale and distribution of its New
York-manufactured equipment." (emphasis added)); *Facit, Inc. v. Krueger, Inc*., 732 F. Supp.
1267, 1273 (S.D.N.Y. 1990) ("The harm alleged to have been inflicted within New York is the
actual or potential loss of business, damage to customer relations, business reputation and
goodwill.  HFT completed substantial interstate sales, *as well as significant New York sales*.
(internal citation omitted) (emphasis added)); *Fantis Foods, Inc. v. Standard Importing Co.*, 402
N.E.2d 122, 126 (N.Y. 1980) (noting that personal jurisdiction depends upon a direct injury
within the state and a "closer expectation of consequences within the State than the indirect
financial loss resulting from the fact that the injured person resides or is domiciled there");
*Sybron Corp. v. Wetzel*, 385 N.E.2d 1055, 1059 (N.Y. 1978) ("It is, however, critical that it is
New York where plaintiff manufactures and relines glass-lined equipment and the alleged trade
secrets were acquired, and *the economic injury plaintiff seeks to avert stems from the threatened*

*loss of important New York customers.*" (emphasis added)); *Polansky v. Gelrod*, 798 N.Y.S.2d 762, 764 (App. Div. 2005) ("[P]laintiff failed to show that he sustained any injury – other than financial loss – in New York. Assuming that defendants' conduct constituted a tort, the situs of such a nonphysical commercial injury is the place where 'the critical events associated with the dispute took place' and not where the resultant monetary loss occurred." (quoting *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433-434 (2d Cir. 1971))).

Here, in its Complaint, Plaintiff has not alleged any injury in the form of decreased sales in the New York market or lost customers in the New York market. Rather, the only specific business injuries mentioned in Plaintiff's Complaint relate to Motiva, a Texas company incorporated in Delaware; CISA, a Mexican company; and an unnamed Brazilian company. (Compl. ¶¶ 3, 14, 25, 28.) Even if the Court were inclined to credit the Declaration submitted by Plaintiff with its response papers, Plaintiff still does not allege any loss of New York customers or sales. The Declaration of Spyro D. Dimitratos, Senior Vice President of Darby Trading Inc., notes that "the customers from which we have lost goodwill and business include Ipiranga (Brazil); Sarita Chemical Co. (India); and Roshfrans (Mexico)," but makes no mention of any New York-based companies. (Decl. of Spyro D. Dimitratos ¶ 5.) Quite simply, Plaintiff alleges that it is selling products to consumers all over the globe – everywhere, that is, but in New York.

The Declaration of Robert J. Fales, President and Owner of Darby Trading Inc., submitted in response to STASCO's Motion, generically states that "since Darby is located only in New York, all of the business it has lost has been in New York." (Decl. of Robert J. Fales ¶ 4.) Yet, Mr. Fales provides not a single example of a New York customer Plaintiff allegedly lost due to STASCO's conduct. Instead, his affidavit only establishes that a New York company has suffered reduced profits. However, "'[t]he occurrence of financial consequences in New York

12

due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York.'" *Whitaker*, 261 F.3d at 209 (quoting *United Bank of Kuwait v. James M. Bridges, Ltd.*, 766 F. Supp. 113, 116 (S.D.N.Y. 1991)); *see Fantis Foods*, 402 N.E.2d at 126 (noting that jurisdiction cannot be predicated solely on "indirect financial loss resulting from the fact that the injured person resides or is domiciled [in New York]"). Because Plaintiff has not adequately alleged an injury in the form of loss of New York sales or New York customers, this Court lacks jurisdiction over STASCO, and STASCO's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.[6] However, the Court will grant Plaintiff thirty days to amend the jurisdictional basis of its claim against STASCO in a manner consistent with this Opinion.

C.  Analysis of Plaintiff's Objections

Plaintiff's objections to Magistrate Judge Yanthis's Report and Recommendation state three specific concerns, which can be summarized as follows:

1.  Magistrate Judge Yanthis erred in holding that Darby's oral contract with Motiva fell within the Statute of Frauds and that Darby's oral contract with Motiva could not be saved via the doctrine of promissory estoppel. Therefore, Magistrate Yanthis incorrectly dismissed Plaintiff's breach of contract claim against Motiva, and Plaintiff's tortious interference with contract claims against STASCO and Shell Oil.

2.  Magistrate Judge Yanthis erred in dismissing Plaintiff's tortious interference with business relations claims against STASCO and Shell Oil for failure to adequately allege "dishonest, unfair, or improper means."

3.  Magistrate Judge Yanthis erred in denying Plaintiff's request for leave to replead its Complaint on the grounds that any amendment would be futile.

The Court reviews de novo these objected-to portions of the Report and

---

[6]Because the Court finds that Plaintiff has not satisfied the situs-of-injury test, the Court need not address the other elements of jurisdiction under Section 302(a)(3)(ii).

Recommendation.  *See* 28 U.S.C. § 636(b)(1)(C).

### 1.  Statute of Frauds

Magistrate Judge Yanthis held that Darby's breach of contract claim against Motiva was barred by the Statute of Frauds, as the plain meaning of the contract obligated Plaintiff to do nothing, but obligated Motiva to supply Darby with STAR base oils indefinitely.  Therefore, the contract could not be completed within one year of the date of contract.  The Court concurs with this assessment.

"'[T]he Statute of Frauds forbids the imposition of a performance obligation on a defendant necessarily extending beyond one year, in the absence of a writing(s) which sets forth all of the essential terms of the agreement imposing that performance obligation.'"  *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02-CV-4635, 2006 WL 1519981, at *10 (S.D.N.Y. June 1, 2006) (quoting *City of Yonkers v. Otis Elevator Co.*, 649 F. Supp. 716, 727 (S.D.N.Y. 1986)).  New York General Obligations Law § 5-701(a)(1) states in pertinent part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

Courts in New York have construed the Statute of Frauds "warily," fearing that strict application may "cause[] more fraud than it prevents."  *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 106 (2d Cir. 1985); *see also Klagsbrun v. Ross*, No. 93-CV-7709, 1995 WL 43664, at *4 (S.D.N.Y. Feb. 3, 1995) ("Courts have long realized that strict application of the statute of frauds causes more fraud tha[n] it prevents." (internal quotation marks omitted)).  Thus, the "one year" provision of the Statute of Frauds has been interpreted to encompass "'only those contracts

which, by their terms, have absolutely no possibility in fact and law of full performance within one year.'" *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007) (quoting *Cron v. Hargro Fabrics, Inc*., 694 N.E.2d 56, 58 (N.Y. 1998)). "If an agreement may be fairly and reasonably interpreted to permit performance within a year, the Statute of Frauds will not bar a breach of contract action no matter how improbable it may be that performance will actually occur within that time frame." *Id.* at 151 (citing *Cron.,* 694 N.E.2d at 58).

The key question is thus whether the agreement between Plaintiff and Motiva, "fairly and reasonably interpreted," permitted the possibility, however slight, that full performance could be completed within one year. *Id.* Here, the Court has little difficulty determining that full performance on the contract could not have been completed within one year. The agreement, as described by Plaintiff, consisted of the following arrangement: Darby promised to persuade CISA to switch to Motiva's STAR base oils, and Motiva, in turn, promised to supply Darby with the STAR base oils that Darby would sell to CISA for an undetermined number of years. Plaintiff clearly understood that this agreement would span longer than one year, and, in fact, it lasted from 1999 to the beginning of 2006. This is quite logical: it is difficult to imagine why Plaintiff would have persuaded a significant customer to use "Group 2" base oils (of which Motiva is the largest provider) without an understanding that Motiva would continue to provide Plaintiff with that product well into the future. In determining "whether a contract is capable of performance within a year for Statute of Frauds purposes, [t]he endurance of defendant's liability is the deciding factor." *Levine v. Zadro Prods., Inc*., No. 02-CV-2838, 2003 WL 21344550, at *4 (S.D.N.Y. June 9, 2003) (internal quotation marks omitted) (alteration in original); *City of Yonkers,* 649 F. Supp. at 727 ("The crucial question is the endurance of the defendant's liability." (quotation marks omitted)). Here, the "arrangement," as Plaintiff describes it in its

15

Complaint, did not provide any means for Motiva to discharge its performance obligations within one year. As such, the supposed contract presents a classic example of the Statute of Frauds. *See Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 298 n.3 (S.D.N.Y. 1997) ("Where an alleged contract, as here, is indefinite as to duration and does not, by its terms, permit the defendant to discharge its performance obligations in less than one year, the statute requires a writing setting forth the essential terms of the agreement."); *City of Yonkers,* 649 F. Supp. at 727 ("[W]here no provision of the agreement alleged permits the defendants to discharge that performance obligation in less than a year, the Statute of Frauds applies.").

In its objections to the Report and Recommendation, Plaintiff posits three ways in which the "arrangement" described above might have been deemed fully performed within one year. First, Plaintiff argues that it could have been unsuccessful in convincing CISA to switch its specifications to the STAR base oil standard, thereby completing the contract within one year. Contrary to Plaintiff's assertions, if Plaintiff had been unsuccessful in persuading CISA to alter its business procedures, there would have been no contract to perform. According to Plaintiff's own pleadings, Motiva offered to "continue to supply" Darby with STAR base oils if Darby was able "to *convince*" CISA to use the STAR base oils. (Compl. ¶ 13.) Had Darby been unable to convince CISA to alter its business processes, no obligation would have been imposed on Motiva, and the issue of performance within one year would have been rendered moot.

Second, Plaintiff argues that it might have decided not to do business with CISA on its own volition within one year of the agreement. Again, Plaintiff's example is unavailing. As noted by Magistrate Judge Yanthis, "where only the party seeking to enforce the oral agreement has an option to terminate the contract within a year, the statute of frauds does bar an action based on the contract." *Miller v. Quik Park Columbia Garage Corp*., No. 93-CV-4730, 1995

WL 238951, at *4 (S.D.N.Y. Apr. 25, 1995); *see also Burke v. Bevona*, 866 F.2d 532, 537 (2d Cir. 1989) (noting that there is "substantial New York authority for the proposition that an oral contract for an otherwise unlimited term cannot be brought within the one-year permissible period of section 5-701(a)(1) by a termination contingency that is exercisable only by the plaintiff") (citing cases). Here, unlike the two cases cited by Plaintiff, *North Shore Bottling Co. v. C. Schmidt and Sons, Inc.*, 239 N.E.2d 189 (N.Y. 1968) and *Coinmach Industries Corp., v. Domnitch*, 340 N.E.2d 735 (N.Y. 1975), Defendant had no express option to terminate the contract, and thus could not have fully performed within the year through such a termination. Indeed, Plaintiff's theory of breach is that Defendant unlawfully terminated the "arrangement" seven years after it was formed. As noted, because "[t]he endurance of defendant's liability is the deciding factor[,]" *Levine*, 2003 WL 21344550, at *4 (internal quotation marks omitted) (alteration in original), Plaintiff cannot bring the agreement outside the Statute of Frauds solely on its own power to terminate the contract within a year.

Third, Plaintiff argues that the manufacturing plants of CISA or Motiva might have been destroyed by natural disaster within one year of contract, satisfying performance of the contract. Here, Plaintiff confuses actions which would fulfill the terms of the contract with actions that would defeat the purpose of the contract:

> There are a number of events, however, which could happen within a year and terminate performance but which would not constitute performance in fulfillment of the terms of the contract but would effect the destruction of the contract. Thus insolvency, bankruptcy, dissolution of defendant's business, retirement from business, impossibility of performance and breach of contract are examples of events which would terminate performance by means of the destruction of the contract rather than by fulfillment of its express terms.

*Dundee Wine & Spirits, Ltd. v. Glenmore Distilleries Co.*, 238 F. Supp. 283, 286 (S.D.N.Y.

1965); *see Zupan v. Blumberg*, 141 N.E.2d 819, 820-21 (N.Y. 1957) (noting that dissolution of contracting party's business does not render contract performed, but rather destroyed); *Cohen v. Bartgis Bros. Co.*, 35 N.Y.S.2d 206, 208 (App. Div. 1942) (citing 2 Williston on Contracts, Rev. 2d, Section 499); *see also Ebker v. Tan Jay Int'l, Ltd.*, 739 F.2d 812, 815 n.3 (2d Cir. 1984) (Friendly, J.) (clarifying the distinction between performance and discharge of a contract). As noted by Motiva, the rule advocated by Plaintiff – that the potential destruction of some essential element to a contract should render that contract outside the Statute of Frauds – would potentially apply to every contract, and render the Statute of Frauds meaningless.

Accordingly, the Court fully agrees with the recommendation of Magistrate Judge Yanthis and holds that the oral agreement between Darby and Motiva falls within the Statute of Frauds, and thus is unenforceable. This cause of action is therefore dismissed with prejudice as Plaintiff's counsel acknowledged at oral argument that Plaintiff could add nothing more by way of allegations regarding the supposed contract.

### 2. Promissory Estoppel

Alternatively, Plaintiff argues that even if its contract with Motiva falls within the Statute of Frauds, the oral contract could be upheld under the doctrine of promissory estoppel. Magistrate Judge Yanthis rejected this argument, concluding that Plaintiff had failed to assert an unconscionable injury, as required by New York law. The Court fully concurs with Magistrate Judge Yanthis's judgment.

"In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made[;] and an injury sustained by the party asserting the estoppel by reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quoting *Arcadian Phosphates,*

*Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989)). However, to invoke the doctrine of promissory estoppel to circumvent the Statute of Frauds, Plaintiff must demonstrate "'unconscionable' injury, i.e., injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement." *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994). Thus, the question is whether the injury sustained by Plaintiff, as pled, can be described as "unconscionable."

To satisfy the "unconscionable injury" threshold, Plaintiff "must demonstrate injuries beyond those that flow naturally from the defendant's non-performance or from the plaintiff's continuing performance of the unenforceable agreement." *Mobile Data Shred, Inc. v. United Bank of Switz.*, No. 99-CV-10315, 2000 WL 351516, at *4 (S.D.N.Y. Apr. 5, 2000) (citing *Merex*, 29 F.3d at 826). "Thus, in the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation." *Id.* (citing *Weissman v. Seiyu, Ltd.*, No. 98-CV-6976, 2000 WL 42205, at *10 (S.D.N.Y. Jan. 18, 2000)).[7]

Plaintiff claims that Motiva's failure to provide STAR base oils "had the effect of cutting off Darby from [the CISA] account." (Compl. ¶ 14.) In addition, by forcing Plaintiff to divert all its remaining supplies of the STAR base oils to satisfy CISA, Plaintiff "thereby lost the sales it would have made to its other customers, as well as the goodwill of said customers, causing substantial damage to Darby's business." (Id. ¶ 15.) These injuries, consisting of lost clients

---

[7]At oral argument, Plaintiff suggested that in this passage, the *Mobile Data Shred* court added a new layer to the "unconscionable injury" requirement – that is, a case involving "egregious circumstances" also could qualify as an exception to the Statute of Frauds. The Court is unpersuaded, as it is apparent that "unconscionable injury" was viewed as synonymous with "egregious circumstances." Thus, this Court follows both *Merex* and *Mobile Data Shred* in determining whether Plaintiff's promissory estoppel claim involves an "unconscionable injury."

and lost opportunities, while perhaps significant to Plaintiff, are most aptly described as the expectation damages of Motiva's non-performance of the unenforceable oral agreement. *See N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel*, No. 99-CV-4643, 2000 WL 1290608, at *3 (S.D.N.Y. Sept. 12, 2000) (holding that loss of substantial clients does not amount to an unconscionable injury); *Mobile Data Shred*, 2000 WL 351516, at *4 (holding that lost business opportunities does not amount to an unconscionable injury). Because the demonstration of such typical expectation damages, without more, does not demonstrate an unconscionable injury, *see Merex*, 29 F.3d at 826, the Court concurs with the judgment of Magistrate Judge Yanthis and holds that the oral contract between Plaintiff and Motiva cannot be saved by promissory estoppel. Thus, Plaintiff's breach of contract claim against Motiva is dismissed for failure to state a claim.[8]

### 3. Tortious Interference with Business Relations

Magistrate Judge Yanthis recommended that Plaintiff's claim for tortious interference with business relations against both STASCO and Shell Oil be dismissed for failure to allege that either defendant "acted with the sole purpose of hurting Darby," or, in the alternative, "used dishonest, unfair, or improper means." (Report and Recommendation at 8-9.) The Court also concurs with this recommendation.

"To prevail on a claim for 'tortious interference with business relations' under New York law, a party 'must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted

---

[8]Plaintiff also alleges that Defendants STASCO and Shell Oil tortiously interfered with the alleged contract between Plaintiff and Motiva. Because the analysis of the tortious interference with contract claim depends upon the analysis of Plaintiff's tortious interference with business relations claim, it will be addressed later in the Opinion. See *infra*.

solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) (hereinafter *Carvel I*)).  Unlike the claim for tortious interference with contract, the lack of a valid contract is not a barrier to a claim for tortious interference with business relations.  *See Scutti Enter., LLC. v. Park Place Entm't Corp*., 322 F.3d 211, 215 (2d Cir. 2003) (hereinafter "*Scutti I*").  Indeed, Plaintiff can recover if it can prove that the Defendants tortiously interfered with "'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting *Hannex Corp. v. GMI, Inc*., 140 F.3d 194, 205 (2d Cir. 1998)).

Plaintiff has adequately alleged the first, second, and fourth elements of this tort – namely, that a business relationship existed between Plaintiff and Motiva, that STASCO and Shell Oil knew about this relationship, and that the relationship was injured.  The pivotal element, however, is the third – the requirement that Plaintiff demonstrate that Defendants STASCO and Shell Oil "acted solely out of malice, or used dishonest, unfair, or improper means[.]"  *State Street Bank*, 374 F.3d at 171.

In *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp*., 406 N.E.2d 445, 448-49 (N.Y. 1980), the New York Court of Appeals elaborated on the level of culpability required to uphold a claim of tortious interference with business relations.  The *Guard-Life* court commented that a defendant may be excused from the consequences of such interference "where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful." *Id*. at 449.  The court further elaborated on the meaning of "wrongful means," quoting approvingly from the Restatement of

Torts, and commented that the definition of "wrongful means" should include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and *some degrees of economic pressure*[,]" but not "persuasion alone." *Id.* (quoting Restatement (Second) of Torts §§ 768 cmt. E; 767 cmt. C (1979)) (emphasis added). As noted by the court, the "wrongful means" standard was meant to require "proof of more culpable conduct on the part of the interferer" in cases where no binding contract had been violated. *Id.*

In 2003, in *Carvel I*, the Second Circuit took up a case which hinged on the meaning of "wrongful means." Understandably perplexed by the vague contours of this concept, the Second Circuit certified a pair of questions to the New York Court of Appeals for clarification of what sort of conduct might amount to "wrongful means." *See Carvel I,* 350 F.3d at 23 ("[A]lthough it is clear that 'wrongful means' . . . can ground liability for a competitor's interference with prospective economic relations, it is unclear just what sort of conduct constitutes those means."). In *Carvel Corp. v. Noonan*, 818 N.E.2d 1100 (N.Y. 2004) (hereinafter *Carvel II*), the New York Court of Appeals addressed the certified questions and attempted to clarify the language of *Guard-Life* and subsequent cases. The *Carvel II* court stated that, as a general rule, in a suit based on tortious interference with a non-binding relationship, the plaintiff must show that the defendant's conduct amounted to a crime or an independent tort. *Id*. at 1103 ("Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations."); *see also Hassan v. Deutche Bank A.G.*, 515 F. Supp. 2d 426, 430 (S.D.N.Y. 2007) (explaining holding of *Carvel II*); *Treppel v. Biovail Corp.*, No. 03-CV-3002, 2005 WL 427538, at *4 (S.D.N.Y. Feb. 22, 2005) (same). However, the *Carvel II* court recognized one exception to this standard: if it could be demonstrated that defendant acted "'for the sole purpose of inflicting

intentional harm on plaintiff[],'" a plaintiff need not show a crime or independent tort. 818

N.E.2d at 1103 (quoting *NBT Bancorp, Inc., v. Fleet/Norstar Fin Group, Inc*., 628 N.Y.S.2d 408,

408 n.1 (App. Div. 1995), *aff'd,* 664 N.E.2d 492 (1996)). Although the court declined to

elaborate on any other exceptions – that is, behavior which, though not a crime or a tort, might

be considered sufficiently culpable to form the basis for a claim – it "left open the possibility that

'extreme and unfair economic pressure' may also constitute 'wrongful means.'" *Hassan*, 515 F.

Supp. 2d at 431 (quoting *Carvel II*, 818 N.E.2d at 1105). The New York Court of Appeals did

not, however, delineate the boundaries of what kind of economic pressure might be considered

"extreme or unfair economic pressure," but rather left that question "for another day." *Carvel II*,

818 N.E.2d at 1104-05 (internal quotation marks omitted); *see also Treppel*, 2005 WL 427538,

at *5 (noting that the *Carvel II* decision "did not offer further guidance on the meaning of

'extreme and unfair'"); *Catskill Dev., L.L.C. v. Park Place Entm't Corp*., 345 F. Supp. 2d 360,

363-64 (S.D.N.Y. 2004) (noting that the court in *Carvel II* "did not set limits on what kind of

conduct might someday be deemed extreme and unfair or egregious"), *rev'd on other grounds*,

169 Fed. App'x 658 (2d Cir. 2006).

 In an effort to flesh out the meaning of "extreme and unfair" economic pressure, Plaintiff

invites the Court to follow the reasoning of *Scutti I,* in which the Second Circuit proposed a test

for assessing wrongful economic conduct. In *Scutti I*, the Second Circuit noted that while the

phrase "some degree of economic pressure" had not been defined by the New York courts, the

Restatement (Second) of Torts – which the New York Court of Appeals relied upon in

formulating the original "wrongful means" test, *see Guard-Life*, 406 N.E.2d at 191 – did provide

some guidance. *Scutti I*, 322 F.3d at 216. In particular, the court in *Scutti I* observed that

   [t]he Restatement recognizes that if one competitor "succeeds in

> diverting business from his competitor by virtue of superiority in
> matters relating to their competition, he serves the purposes for
> which competition is encouraged," while "economic pressure on
> the third person in matters unrelated to the business in which actor
> and the other compete is treated as an improper interference."

*Id.* (quoting Restatement (Second) of Torts § 768 cmt. E). From this language, the court in *Scutti I* developed a two-part inquiry to determine whether economic pressure is wrongful. *Id.* First, the court asks whether the actions by the defendants rise to the level of economic pressure (and not mere persuasion).[9] Second, if the actions of the defendants rise to the level of economic pressure, the court then inquires whether the pressure is related or unrelated to the business in which the defendants and the plaintiff engage. Only if the pressure is unrelated to the parties' common business will the court entertain a finding of wrongful means. *See id.*

Plaintiff's allegations of tortious interference with business relations focus on "STASCO and/or Shell Oil's direction to Motiva to cease purchasing [hydrocracker] bottoms from Darby and instead to purchase [hydrocracker] bottoms from STASCO at a higher price and/or at less advantageous terms." (Compl. ¶ 40.) These actions surely relate to the common business pursued by Plaintiff and Defendants Motiva, STASCO, and Shell Oil, thus failing the second part of the *Scutti I* inquiry. *See Scutti I*, 322 F.3d at 217. The two-part inquiry of *Scutti I*,

_____

[9]Quoting the Restatement, the court in *Scutti I* observed that the propriety of economic pressure must be measured

> in the light of the circumstances in which it is exerted, the object
> sought to be accomplished by the actor, the degree of coercion
> involved, the extent of the harm that it threatens, the effect upon
> the neutral parties drawn into the situation, the effects upon
> competition, and the general reasonableness and appropriateness of
> this pressure as a means of accomplishing the actor's objective.

322 F.3d at 216 (quoting Restatement (Second) of Torts § 767 cmt. C).

therefore, is unavailing to Plaintiff.[10]

Placing *Scutti I* aside, there remains a dearth of concrete guidance regarding what kind of economic pressure – other than those actions which amount to a crime, an independent tort, or which are committed "for the sole purpose of inflicting intentional harm on plaintiff" – constitutes "wrongful means." The New York Court of Appeals has only hinted that the "wrongful" conduct must be "egregious." *Carvel II*, 818 F.3d at 1104. Thus, the question before this Court is whether the conduct allegedly committed by STASCO and Shell Oil – the pressuring of an affiliate to purchase supplies from a higher-priced sister company rather than from Plaintiff – amounts to a crime or an independent tort; was done for the sole purpose of injuring Plaintiff; or constitutes the sort of "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to the general rule of *Carvel II*.

---

[10]It is unclear whether the two-part inquiry proposed in *Scutti I* still has vitality. *Scutti I* was decided prior to the New York Court of Appeals' decision in *Carvel II*. *Scutti I* was subsequently remanded, and upon appeal of the case, the Second Circuit (in an unpublished opinion) hewed very closely to the legal standard later laid out in *Carvel II*. *See Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc*., 836 N.Y.S.2d 807, 811 (Sup. Ct. 2007) (noting that "the United States Court of Appeals recognized, in an appeal, after remand, in the *Scutti* case [*Scutti Enters., LLC v. Park Place Entm't Corp*., 173 Fed. App'x 75 (2d Cir. 2006) (hereinafter "*Scutti II*")], that the *Carvel* decision limited its 2003 decision"). However, *Scutti II*, an order with no precedential value, could be interpreted as upholding the viability of the two-part inquiry of *Scutti I*. In *Scutti II*, the Court concluded that "[n]o reasonable fact-finder . . . could conclude that [the defendant's actions] were unrelated to [the defendant's] legitimate interests . . . or were motivated by anything other than legitimate business reasons." *Id.* at 2 (quoting *Scutti II*, 173 Fed. App'x at 77). This statement could be construed as an application of the second part of the two-part *Scutti I* test – whether the actions of the defendant relate to the business of the plaintiff, *see Scutti I*, 322 F.3d at 216 – or as an application of the lone exception discussed by the *Carvel II* court – whether the behavior in question was "for the sole purpose of inflicting intentional harm on plaintiff[]," *see Carvel II*, 818 N.E.2d at 1103. However, under either construction – regardless of whether *Scutti II* indicates an abandonment or affirmation the *Scutti I* test – the disposition for Plaintiff here will be the same, as Plaintiff has failed to allege that the conduct at issue was done either for the primary purpose of inflicting harm on Plaintiff, or was unrelated to Plaintiff's business.

The first and second parts of this question are easily answered. Plaintiff has not at all alleged that Defendants' alleged conduct amounts to a crime or an independent tort. In addition, Plaintiff has not adequately alleged that STASCO and Shell Oil pressured Motiva for the *sole* purpose of harming Plaintiff. The Complaint states that STASCO and Shell Oil pressured Motiva to make its purchases of hydrocracker bottoms from within the corporate family rather than from outside companies like Darby. Such behavior demonstrates a desire to funnel profits to jointly-owned corporations rather than to non-affiliated companies. While such behavior may not maximize the earning potential of Motiva, it hardly evinces a deliberate effort engineered "for the sole purpose of inflicting intentional harm on plaintiff[]." *Carvel II*, 818 N.E.2d at 1103.

The third part of this question is less clear. Plaintiff argues that STASCO and Shell Oil's pressuring of Motiva to eschew the better-priced goods offered by Plaintiff and instead to purchase from STASCO constitutes wrongful means. As support for this position, Plaintiff cites language from the Restatement (Second) of Torts, which emphasizes that economic behavior that offends competition and efficiency can potentially amount to "wrongful means:"

> The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged. If, however, he diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

Restatement (Second) of Torts § 768 cmt. E.[11]  This language, however, is unavailing, as the

economic pressure brought to bear by STASCO and Shell Oil against Motiva *was* related to the

business in which Plaintiff and Defendants engage.  Moreover, even if the business had not been

related, Plaintiff has not alleged conduct which is sufficiently "extreme," "unfair," and

"egregious" to warrant a new exception to the general rule of *Carvel II*.  This is probative

because in the years since *Carvel II* was decided, courts have been stingy in their interpretation

of this tort, and have resisted invitations to go beyond the language of the Court of Appeals.  *See,*

*e.g., Milton Abeles, Inc. v. Farmers Pride, Inc.*, No. 03-CV-6111, 2007 WL 2028069, at *4

(E.D.N.Y. July 11, 2007) (noting that the demonstration of "some degree of economic pressure"

is insufficient to uphold the tort claim if plaintiff does not demonstrate purposeful infliction of

intentional harm); *Masefield AG v. Colonial Oil Indus.*, No. 05-CV-2231, 2006 WL 346178, at

*9 (S.D.N.Y. Feb. 15, 2006) ("It is not clear what 'extreme and unfair' means, and whether

economic pressure can be 'extreme and unfair' without being tortious and criminal."); *Treppel*,

2005 WL 427538, at * 7 ("[P]laintiff has not directed the Court to any conduct that is sufficiently

egregious to justify a second exception to the rule and therefore, the allegations against the Three

Defendants must fall within the purview of the general rule or the malice exception."); *Shared*

*Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*, 803 N.Y.S.2d 512, 513 (App. Div.

---

[11]This comment elaborates on subsection (1)(b) of the Restatement (Second) of Torts § 768.  The text of that section is as follows:

§ 768. Competition As Proper Or Improper Interference
(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if . . .
(b) the actor does not employ wrongful means . . .

2005) ("The claim for tortious interference with prospective business relations failed to include the necessary allegation that defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or other economic considerations."); *Martian Entm't, LLC v. Harris*, 824 N.Y.S.2d 769, at *8 (Sup. Ct. 2006) (noting that allegations that defendant sought to persuade a third party not to do business with plaintiff does not meet the standard of wrongful means); *Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc.*, No. 60045, 2005 WL 4441899, at *7 (N.Y. Sup. Ct. Dec. 19, 2005) ("[T]he complaint contains nothing indicating the . . . defendants acted beyond mere self-interest or other economic considerations. This is insufficient to support a claim for tortious interference with prospective business relations."). Plaintiff's Complaint, which merely alleges that the various interlocked companies in the Shell family preferred to purchase from each other rather than from outside companies, does not offer an example of "egregious" conduct "so 'culpable' . . . that it could be the basis for a claim of tortious interference with economic relations." *Carvel II*, 818 N.E.2d 1103-04; *see also Masefield AG*, 2006 WL 346178, at *9 (holding that "conclusory allegation[s]" that defendant used coercive business practices to intentionally interfere with business relations was insufficient to state a claim); *Advanced Global Tech.,* 836 N.Y.S.2d at 811 (holding that plaintiff's allegations that defendant engaged in coercive business practices "without justification, entirely out of malice" and without "normal economic self-interest" were conclusory and thus insufficient to state a claim). Accordingly, the Court concurs with the recommendation of Magistrate Judge Yanthis and dismisses Plaintiff's claims of tortious interference with business relations for failure to state a claim.

### 3.  Tortious Interference with Contract

Plaintiff also alleges that Defendants STASCO and Shell Oil tortiously interfered with the alleged contract between Plaintiff and Motiva.  This claim focuses on the alleged pressure exerted by STASCO and Shell Oil on Motiva, which resulted in Motiva refusing to sell STAR base oils to Plaintiff, thereby undermining a seven-year business arrangement between Plaintiff and Motiva.

Defendants STASCO and Shell Oil argue that because Plaintiff's contract with Motiva fails to satisfy the Statute of Frauds, Plaintiff cannot make a claim for tortious interference with contract, as it cannot allege the existence of a valid contract.  Plaintiff, on the other hand, argues that Defendants STASCO and Shell Oil cannot interpose Motiva's Statute of Frauds defense, as STASCO and Shell Oil were not parties to the original contract.

Plaintiff is correct in asserting that STASCO and Shell Oil cannot utilize Motiva's Statute of Frauds defense.  "[A] contract not drawn in accordance with the Statute of Frauds is not ipso facto void but only voidable, subject to being declared void if and when the statute is interposed as a defense 'at the proper time and in the proper way.'"  *Felicie, Inc. v. Leibovitz*, 412 N.Y.S.2d 625, 626-27 (App. Div. 1979).  Here, however, Defendants STASCO and Shell Oil have not interposed the defense in the proper way, as "[t]he Statute of Frauds is a personal defense and cannot be availed of by a third party."  *Id.* at 627 (quoting *Stitt v Ward*, 127 N.Y.S. 351, 351 (App. Div. 1911)); *see also Vincent v. Seaman*, 544 N.Y.S.2d 225, 227 (App. Div. 1989) ("A Statute of Frauds defense, however, is a defense personal to the assignor and cannot be raised by defendant, a stranger to the assignment agreement, to defeat the enforceability of the contract of sale."); *Dante v. 310 Assocs.*, 503 N.Y.S.2d 786, 788 (App. Div. 1986) ("[T]he Statute of Frauds is a personal defense which cannot be interposed by a third party"); *Raoul v.*

*Olde Vill. Hall, Inc.,* 430 N.Y.S.2d 214, 220 (App. Div. 1980) ("[A]n oral contract within the statute is not absolutely invalid but is only voidable and unenforceable at the election of the party to be charged or his successors in interest . . . .").

Although Defendants STASCO and Shell Oil cannot interpose the Statute of Frauds as a defense to Plaintiff's tortious interference with contract claim, the fact that the contract in question is unenforceable – and thus voidable – against Motiva nonetheless changes the analysis of Plaintiff's claim against STASCO and Shell Oil. As noted by the New York Court of Appeals in *Guard-Life*, a claim of tortious interference with a voidable contract – as opposed to an enforceable contract – should be treated the same as a tortious interference with business relations claim. *See* 406 N.E.2d at 449 ("[W]e are persuaded that interference with performance of voidable contracts should be treated the same as interference with contracts terminable at will for purposes of imposing liability in tort, and that both fall in the same category with interference with prospective contractual relations."); *see also Cent. Sports Army Club v. Arena Assocs., Inc.*, 952 F. Supp. 181, 190 (S.D.N.Y. 1997) (noting that because the agreement at issue was voidable, "there is no liability for interference with such an agreement absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive" (citing *Guard-Life*)); *Taub v. Amana Imports, Inc.*, 528 N.Y.S.2d 884, 885 (App. Div. 1988) ("[T]he existence of a valid, enforceable contract is a necessary predicate for a cause of action sounding in intentional interference with performance of a contract. However, recovery may nonetheless be had where, although the contract on which the plaintiff relies is voidable, the defendant has induced a party not to abide by its terms by means of fraud or other misconduct (citing *Guard-Life*) (internal citations omitted)); *see also* John Danforth, Note, *Tortious Interference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity*, 81 COLUM.

L. REV. 1491, 1504 (1981) ("Similarly, the *Guard-Life* majority reasoned, unenforceable contracts contain no legal guarantee of future performance, and so should only be allowed limited tort protection. The *Guard-Life* decision clearly indicates that, for New York, an analysis of tort liability for interference with contract begins (and perhaps ends) with an assessment of the legally enforceable rights enjoyed by the plaintiff in his contract." (internal footnotes omitted)). Because Plaintiff's contract with Motiva is unenforceable and thus voidable, Plaintiff's tortious interference with contract claim against STASCO and Shell Oil must satisfy the more demanding standard required of claims of tortious interference with business relations. Thus, Plaintiff's claim regarding STASCO's and Shell Oil's allegedly tortious interference with Plaintiff's STAR base oil contract with Motiva will be analyzed in the same manner that the Court analyzed Plaintiff's claim for tortious interference with business relations over the hydrocracker bottoms feedstock transactions.

Here, as with Plaintiff's previous tortious interference claim, Plaintiff has failed to properly allege "wrongful means," a necessary element of the claim. "Wrongful means" can be satisfied if Plaintiff alleges that Defendants engaged in conduct that: (1) amounts to a crime or independent tort; (2) was done for the sole purpose of injuring Plaintiff; or (3) constitutes "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to the general rule of *Carvel II*. Because Plaintiff fails to claim that Defendants committed a crime, independent tort, or acted solely for the purpose of harming Plaintiff, Plaintiff's claim again depends upon the Court finding that Plaintiff's allegations constitute the sort of "extreme," "unfair," and "egregious" behavior which might warrant an additional exception to *Carvel II*. And, while the allegations made by Plaintiff in regard to the STAR base oil episode are perhaps more unsavory than the allegations made regarding the hydrocracker episode, the facts are not

31

sufficiently "extreme," "unfair," or "egregious" such that the Court might craft a new exception to the law. However, because Plaintiff indicated at oral argument that it could produce more facts to buttress its claim, the Court grants Plaintiff thirty days to amend its tortious interference with contract claim against STASCO and Shell Oil in a manner consistent with this Opinion.

### III. Conclusion

For the reasons stated herein, Defendant STASCO's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED without prejudice, but Plaintiff shall be given thirty days to amend its Complaint in a manner consistent with this Opinion. Defendant Motiva's Motion to Dismiss for Failure to State a Claim is GRANTED with prejudice. Defendants STASCO and Shell Oil's Motions to Dismiss for Failure to State a Claim are GRANTED without prejudice, but Plaintiff shall be given thirty days to amend its tortious interference with contract claim in a manner consistent with this Opinion. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt. Nos. 12, 16, 21) and enter judgment for Motiva.

SO ORDERED.

Dated:    March 25, 2008
          White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

32

Service List:

Manuel Ralph Llorca, Esq.
Llorca & Hahn LLP
40 Richards Avenue
Norwalk, CT 06854
Email: m.llorca@llorcahahn.com
*Counsel for Plaintiff*

Jennifer Davidow, Esq.
Vinson & Elkins
1001 Fannin Street
23rd Floor
Houston, TX 77002
*Counsel for Shell International Trading And Shipping Company Limited*

Phillip Bruce Dye, Jr., Esq.
Vinson & Elkins
1001 Fannin Street
23rd Floor
Houston, TX 77002
Email: pdye@velaw.com
*Counsel for Shell International Trading And Shipping Company Limited*

Ronald Leslie Oran, Jr., Esq.
Vinson & Elkins
666 Fifth Avenue, 26th Floor
New York, NY 10103
Email: roran@velaw.com
*Counsel for Shell International Trading And Shipping Company Limited*

Michael Stephan Kraut, Esq.
Morgan, Lewis and Bockius LLP
101 Park Avenue
New York, NY 10178
Email: mkraut@morganlewis.com
*Counsel for Motiva Enterprises LLC*

Robert D. Owen, Esq.
Fulbright & Jaworski L.L.P.
666 Fifth Avenue - 30th Floor
New York, NY 10103
Email: rowen@fulbright.com
*Counsel for Shell Oil Company*

Felice Beth Galant, Esq.
Fulbright & Jaworski L.L.P.
666 Fifth Avenue - 30th Floor
New York, NY 10103
Email: fgalant@fulbright.com
*Counsel for Shell Oil Company*

Sarah E. O'Connell, Esq.
Fulbright & Jaworski L.L.P.
666 Fifth Avenue - 30th Floor
New York, NY 10103
Email: soconnell@fulbright.com
*Counsel for Shell Oil Company*

Copy to:

The Honorable George A. Yanthis
United States Magistrate Judge